22CA2274 Peo v Smith 08-01-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA2274 Larimer County District Court No. 18CR1921 Honorable Juan G. Villaseñor, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Kirk Adam Smith, Defendant-Appellant. ORDER REVERSED AND CASE REMANDED WITH DIRECTIONS Division IV Opinion by JUDGE PAWAR Navarro and Johnson, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 1, 2024 Philip J. Weiser, Attorney General, Brittany Limes Zehner, Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee Fischer Law Group, P.C., Erik G. Fischer, Ashleigh Bravo, Fort Collins, Colorado, for Defendant-Appellant
 22CA2273 Peo v Davenport 08-01-2024 COLORADO COURT OF APPEALS Court of Appeals No. 22CA2273 Larimer County District Court No. 18CR1915 Honorable Juan G. Villaseñor, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Benjamin Eugene Davenport, Defendant-Appellant. ORDER REVERSED AND CASE REMANDED WITH DIRECTIONS Division IV Opinion by JUDGE PAWAR Navarro and Johnson, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 1, 2024 Philip J. Weiser, Attorney General, Brittany Limes Zehner, Assistant Solicitor General, Denver, Colorado, for Plaintiff-Appellee Fischer Law Group, P.C., Erik G. Fischer, Ashleigh Bravo, Fort Collins, Colorado, for Defendant-Appellant 
1 ¶ 1 Defendants, Benjamin Eugene Davenport and Kirk Adam Smith, were indicted by a grand jury on over thirty counts each, including counts of theft, forgery, money laundering, conspiracy to commit theft, tax evasion, and violating the Colorado Organized Crime Control Act (COCCA). All of those claims were dismissed. In exchange for that dismissal, defendants agreed to plead guilty to a single count each of making a misleading filing with the Colorado Securities Commissioner. The plea agreement also provided that defendants “agree to holding a restitution hearing” as to some of the dismissed counts. ¶ 2 The district court held a restitution hearing and ordered defendants to pay over $740,000 in restitution, jointly and severally, to the victim, Blue Ocean Enterprises, Inc. Defendants appeal that order. We conclude that the evidence was insufficient to support that amount of restitution. We therefore reverse the order and remand the case to the district court with directions. I. Background ¶ 3 The following facts are either findings made by the district court or uncontroverted evidence from the record. 
2 ¶ 4 Blue Ocean is a “family office,” meaning it services the various businesses owned by a single family, in this case, the family of Curt Richardson. Blue Ocean also invests in smaller businesses. One of the businesses Blue Ocean invested in was Blue Point Pellets, LLC (BPP). Defendant Davenport was the president of BPP, and defendant Smith was the chief financial officer. The managers of BPP were Davenport, Smith, Curt Richardson, and another Blue Ocean employee, Kurt Hoeven. ¶ 5 In 2012, BPP owned a wood pellet factory in Denmark. At that time, Blue Ocean owned 51% of BPP and defendants owned 49%. Over the next several years, Blue Ocean invested more and more money in BPP. This investment diluted defendants’ ownership. By 2014, defendants’ interest in BPP had been diluted to less than a thousandth of a percent. ¶ 6 Also in 2014, wood pellets had become unprofitable to manufacture and sell. Defendants proposed a pivot for BPP: equipping the Danish factory to manufacture plastic pellets instead of wood. But they couldn’t execute that pivot by themselves. Because Blue Ocean financed all of BPP’s activities and two Blue Ocean people were BPP managers (Richardson and Hoeven), 
3 defendants needed Blue Ocean on board. So they pitched the pivot to Blue Ocean. The pitch included a path for defendants to regain lost equity in BPP and a share of any intellectual property that might be created in developing the plastic pellet manufacturing process. Put simply, defendants sought to be rewarded if their new idea was successful. ¶ 7 Blue Ocean authorized BPP to explore pivoting to plastic pellets. And defendants were told they would receive written agreements codifying their path back to more equity in BPP and a share of any intellectual property should the pivot prove successful. But Blue Ocean never created the agreements. Indeed, Brent Keele, a Blue Ocean lawyer who eventually became Blue Ocean’s president, testified that he delayed drafting those agreements because he and Blue Ocean never intended to offer them. ¶ 8 Meanwhile, defendants were moving ahead with the pivot to plastic pellets. Equipping the Danish wood pellet factory to produce plastic pellets would require different equipment. To meet this need, defendants bought a separate company that would develop the equipment and sell it to BPP. That company was called Elemental Technologies, LLC, and defendants were its sole 
4 members. Defendants did not disclose their ownership of Elemental to Richardson, Hoeven, or anyone at Blue Ocean. Consequently, BPP, with Blue Ocean’s consent and financing, worked towards purchasing two friction blenders and a block press from Elemental. Blue Ocean and BPP’s Blue Ocean members were unaware that defendants were on both sides of those purchases. ¶ 9 Before the two friction blenders were delivered, and before the block press had been fully fabricated, Keele, Blue Ocean’s attorney and future president, discovered that defendants owned Elemental. Defendants were quickly fired from their positions at BPP. But that did not stop BPP (backed and actively run by Blue Ocean) from making subsequent payments for the friction blenders, accepting delivery of them, and using one of them in the Danish factory.
1 ¶ 10 As for the block press, even after defendants’ firing, BPP made an additional payment for the development of that machine. Only seven months after defendants’ firing did BPP cancel its order with Elemental for the block press. 1 The record indicates that BPP has never used the second friction blender, but there is also no indication that it is not functional. 
5 ¶ 11 After using one of the friction blenders for several years in the Danish factory, BPP planned to sell both blenders to Otterbox, another company owned by Richardson and affiliated with Blue Ocean. Blue Ocean and Otterbox planned to make recycled plastic products with them. At the time of the restitution hearing, BPP had not sold the friction blenders. ¶ 12 After receiving the two functional friction blenders from Elemental, BPP and Blue Ocean contacted law enforcement and urged them to investigate defendants for what they had done. The prosecution convened a grand jury, which returned indictments on over thirty counts each for defendants. For their nondisclosure of their interest in Elemental, the counts included theft, forgery, money laundering, and violations of COCCA. ¶ 13 Ultimately, the parties reached the plea agreement described above: all grand jury counts were dismissed, defendants pleaded guilty to a single added count, and defendants agreed “to holding a restitution hearing as to [the counts involving Elemental].” The district court held a restitution hearing and awarded two separate categories of restitution. First, it awarded the amount that BPP paid Elemental for the friction blenders and block press before BPP 
6 discovered that defendants owned Elemental (with several smaller deductions we will address later). This amount came to $529,525.49. The second category was $214,098.54 for investigative costs that BPP and Blue Ocean incurred to purportedly discover the extent of the losses. Notably, the court did not address any value Blue Ocean/BPP received in the transaction from its receipt, use, and potential sale of the friction blenders. ¶ 14 Defendants challenge the restitution award on various grounds, including that the court lacked authority to impose any restitution award and that Blue Ocean/BPP suffered no actual loss. ¶ 15 We conclude that the court had authority to impose restitution. But we conclude that the evidence was insufficient to support the amount of restitution awarded — specifically the $529,525.49 the district court found that Blue Ocean lost in the transaction with Elemental. II. Defendants Agreed to the Imposition of Restitution ¶ 16 After the plea agreement and guilty pleas but before the restitution hearing, our supreme court announced People v. Roddy, 2021 CO 74. In that opinion, the court confirmed that a defendant cannot be ordered to pay restitution for a loss caused by conduct 
7 that formed the basis of only a dismissed count or uncharged crime. Id. at ¶¶ 28-29. But the court identified an exception. A defendant may agree in the plea agreement to extend the scope of restitution to include conduct underlying dismissed counts. Id. Accordingly, a court may order restitution for conduct underlying a dismissed count if the defendant agrees, “at the time the plea agreement is entered on the record, to pay restitution for pecuniary loss beyond that proximately caused by the conduct essential to the charges to which he pleads guilty.” Id. at ¶ 32. ¶ 17 Defendants argue that any restitution for their Elemental-
related conduct was improper because that conduct was the basis of dismissed counts, and they did not agree to expand the scope of restitution. We review the district court’s authority to impose restitution de novo. Id. at ¶ 23. When interpreting the parties’ obligations under a plea agreement, we attempt to discern “the meaning a reasonable person would have attached to the agreement at the time the agreement was entered into.” People v. Antonio-
Antimo, 29 P.3d 298, 303 (Colo. 2000). To do so, we look to the plain language of the agreement, resolving any ambiguity in the defendant’s favor. Roddy, ¶ 24. 
8 ¶ 18 Defendants are correct that the written plea agreement does not explicitly say that they agree to pay restitution for the Elemental-related conduct. Instead, it says “the People and the defendant[s] agree to holding a restitution hearing as to Counts [related to Elemental]. The People agree to not seek restitution for Counts 1-11.” ¶ 19 Based on this language, the only thing defendants explicitly agreed to was a restitution hearing. And this explicit agreement did not preclude them from arguing, as they did at the hearing, that the court lacked authority to impose restitution because they did not agree to it. That said, a reasonable person would have understood from the plea agreement that defendants agreed that the court had authority to impose restitution for their Elemental-related conduct (provided the prosecution could prove that conduct proximately caused a loss). Indeed, at the sentencing hearing when the district court accepted the plea agreement, defense counsel characterized defendants as having “agreed to a sentencing concession for the repayment of potential restitution.” See Roddy, ¶ 32 (An “oral representation on the record during a dispositional hearing plainly 
9 supplementing the written plea agreement” may indicate an agreement to restitution on dismissed counts.). ¶ 20 Based on this record, we conclude that a reasonable person would have unambiguously understood that defendants agreed to pay any restitution the prosecution could prove based on their Elemental-related conduct.
2 The district court therefore had authority to impose restitution based on that conduct. So we proceed to address defendants’ challenges to the restitution amount. III. The Restitution Award ¶ 21 Restitution is any pecuniary loss suffered by the victim that is “proximately caused by an offender’s conduct and that can be reasonably calculated and recompensed in money.” § 18-1.3- 2 We are confused by the district court’s seemingly contradictory statements about this issue in its order. The court clearly exercised its authority to impose restitution. But, as pointed out by defendants, the court wrote the following: “Defendants note, and the Court agrees, that they didn’t agree (as part of their plea agreements) to pay restitution for any counts related to Elemental. And while, generally, ‘a court may not order restitution for injury or losses proximately caused by conduct that forms the basis of only the dismissed charge[s],’ [People v.] Roddy, [2021 CO 74, ¶ 28], defendants’ plea agreements allow the Court to impose restitution based on multiple dismissed counts.” (Emphasis in original). 
10 602(3)(a), C.R.S. 2023. It is limited to the victim’s actual economic loss and therefore does not include things like loss of future earnings or punitive damages. Id. Restitution seeks only to return the victim to the same financial position they were in before the events at issue, not put the victim in a better financial position. People v. Perez, 2017 COA 52M, ¶ 19. Accordingly, the restitution scheme seeks to avoid double recovery. People v. Gregory, 2019 COA 184, ¶ 24. ¶ 22 It is the prosecution’s burden to prove by a preponderance of the evidence both the amount of the loss and that the loss was proximately caused by a defendant’s conduct. People v. Babcock, 2023 COA 49, ¶ 19 (cert. granted Apr. 8, 2024). On the other hand, it is a defendant’s burden to prove any setoffs that might apply, such as a civil settlement for the same damages covered by the restitution. See Gregory, ¶ 25; People v. Lassek, 122 P.3d 1029, 1035 (Colo. App. 2005), overruled on other grounds by Sullivan v. People, 2020 CO 58, ¶ 18. ¶ 23 Defendants challenge the restitution award in three ways. First, they argue that the prosecution failed to prove at the restitution hearing that defendants’ conduct was criminal. Second, 
11 they argue that Blue Ocean suffered no loss in the transaction with Elemental, let alone a $529,525.49 loss. And third, they argue that the prosecution failed to prove that all the $214,098.54 for investigatory costs was incurred to investigate defendants’ Elemental-related conduct. We address each argument in turn. A. The Prosecution Did Not Have to Prove Criminal Conduct ¶ 24 We are somewhat perplexed by defendants’ argument that the prosecution failed to prove that their conduct was criminal at the restitution hearing. As explained above, defendants agreed to pay restitution for Elemental-related conduct if the prosecution could prove that the conduct proximately caused a loss. It therefore seems beside the point whether defendants’ Elemental-related conduct was criminal — criminal or not, defendants agreed to pay any restitution based on that conduct that the prosecution could prove caused a loss. ¶ 25 In our view, the prosecution had to prove only a loss that was proximately caused by defendants’ conduct underlying the dismissed counts for which defendants agreed to pay restitution. 
12 We next address defendants’ arguments about how the prosecution failed to prove the elements of restitution.
3 B. Evidence was Insufficient to Support Restitution for All Money BPP Paid Elemental Before Discovering Defendants Owned It ¶ 26 Defendants’ argument that Blue Ocean suffered no loss in the transaction with Elemental, let alone a $529,525.49 loss, is a challenge to the sufficiency of the evidence. We therefore review the district court’s assessment of Blue Ocean’s loss de novo. See People v. Barbre, 2018 COA 123, ¶ 25. Our task is to determine whether the evidence, viewed as a whole and in the light most favorable to the prosecution, establishes by a preponderance of the evidence that Blue Ocean suffered that amount of loss. See id. We conclude it does not. ¶ 27 The $529,525.49 loss the district court calculated from the Elemental transaction itself (i.e., excluding loss from investigative costs) was the total amount BPP paid Elemental for the equipment 3 We note that defendants’ arguments do not include a challenge to the finding that their conduct proximately caused Blue Ocean’s loss in the transaction with Elemental. 
13 before Blue Ocean knew that defendants were owners of Elemental.
4 But problematically, the prosecution failed to establish that Blue Ocean received nothing of value in exchange for its money. And because Blue Ocean received some value in the transaction, it was not entitled to all its pre-discovery money back. ¶ 28 The uncontroverted evidence showed that BPP received two friction blenders from Elemental, one of which it used to produce plastic pellets for some period of time. Although BPP never used the second, the record indicates that at one time BPP intended to sell both machines to Otterbox to make recycled plastic products. There was also uncontroverted evidence that a friction blender with one-fifth the capacity of Elemental’s was priced at $125,000, and a friction blender with a similar capacity to Elemental’s was priced at almost $700,000. The only conclusion to draw from this evidence is that the friction blenders had at least some pecuniary value. 4 This amount is also the product of three categories of deductions based on how Elemental disbursed money from its accounts. We fail to see how Elemental’s disbursements could have affected the amount of Blue Ocean’s loss, but this issue is not before us and therefore we say no more about it. 
14 ¶ 29 We recognize, as stated above, that a defendant bears the burden to prove a setoff to reduce a restitution award. A setoff is generally compensation a victim receives for its loss through means extrinsic to the criminal transaction. See Gregory, ¶ 16 (addressing a settlement agreement as a setoff to restitution); People v. Madison, 2018 COA 62, ¶ 24 n.2 (where the defendant stole many bottles of expensive wine, if law enforcement sold the recovered wine and distributed proceeds to the victims, defendant was entitled to a setoff against restitution for those distributed proceeds), overruled on other grounds by People v. Weeks, 2021 CO 75; People v. Hoisington, 902 P.2d 887, 888-89 (Colo. App. 1995) (accepting defendant-employee’s unpaid wages as a setoff against restitution for victim-employer).
5 But the value that Blue Ocean received in exchange for the money it paid Elemental is not a setoff — it was part of the transaction that constituted the alleged crimes and is 5 Indeed, there was evidence of potential setoffs in this case. A civil case between Blue Ocean and defendants settled during this appeal. See § 18-1.3-603(3)(b)(II), C.R.S. 2023 (Restitution award may be decreased if “the defendant has otherwise compensated the victim or victims for the pecuniary losses suffered.”). And Blue Ocean’s former attorney and president testified that Blue Ocean took a twenty-eight- or thirty-million-dollar theft loss on its tax returns. 
15 therefore part of the loss calculation in the first instance. Consequently, to justify restitution for all the money Blue Ocean paid Elemental before it knew about defendants’ ownership, the prosecution had to prove by a preponderance of the evidence that Blue Ocean received nothing of value from Elemental in return for the money it paid. And based on the uncontroverted evidence described above, we conclude that the prosecution failed to carry this burden. We therefore agree with defendants that there was insufficient evidence to support the district court’s determination that Blue Ocean’s loss in the transaction was $529,525.49 (the total amount it paid Elemental before it knew about defendants’ ownership). ¶ 30 This holding is consistent with the restitution scheme’s goal of returning the victim to their pre-crime financial position, not putting them in a better one. See Perez, ¶ 19. Giving Blue Ocean its money back in addition to the equipment it used that money to buy would leave Blue Ocean better off, not merely return it to its original position. 
16 C. Investigative Costs ¶ 31 Finally, defendants argue that the prosecution failed to prove that Blue Ocean’s investigative costs of $214,098.54 were all related to investigating the Elemental-related conduct that was within the scope of restitution. This argument does not challenge the quantum of evidence supporting the investigative costs Blue Ocean incurred. Instead, it challenges the district court’s (unexplained) conclusion that all these investigative costs were proximately caused by defendants’ Elemental-related conduct. See Martinez v. People, 2024 CO 6M, ¶ 20 (characterizing a challenge to a restitution award based on its substance, not its form). ¶ 32 In the restitution context, we review a proximate cause determination for clear error. Id. at ¶ 32. This means we must affirm the district court’s proximate cause finding unless it is without record support. Id. at ¶ 34. ¶ 33 Proximate cause is a cause that in natural and probable sequence produces the claimed loss. Id. at ¶ 13. ¶ 34 The record includes invoices from two forensic accounting firms hired by Blue Ocean to audit BPP and uncover any fraud. The invoices include dates and payment amounts but do not 
17 identify investigation subjects or investigative activities associated with any of the payment amounts. However, Brent Keele testified that Blue Ocean initiated the forensic accounting investigation in the wake of discovering defendants’ nondisclosure to answer “questions about how [BPP] was run, about how [BPP] had been operated, about where cash was and where equipment was . . . just to see if there was anything that stuck out as fraudulent.” He then explained that “[a]s we got further in the process, then we wanted to understand about the Elemental Technologies transaction.” ¶ 35 The implication of Keele’s testimony is that defendants’ nondisclosure triggered the forensic accounting investigation and eventually became its focus. This is not strong evidence that every dollar Blue Ocean spent on the investigation was the natural and probable outcome of defendants’ nondisclosure, but it is at least some. And because we will not reverse a proximate cause determination unless it is entirely unsupported by the record, we must affirm the proximate cause determination here. We therefore reject defendants’ challenge to the proximate cause finding supporting the restitution award for investigative costs. 
18 IV. Disposition ¶ 36 The restitution award is reversed, and the case is remanded to the district court with directions to reconsider restitution in a manner consistent with this opinion. JUDGE NAVARRO and JUDGE JOHNSON concur.